# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00285-CV

**A. K. and T. A., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-19-008463, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A.K. (Mother) and T.A. (Father) appeal from the trial court's order terminating Mother's parental rights to K.L.H., who was born in December 2007, and their parental rights to T.A.A., who was born in February 2013; T.K.A., who was born in February 2014, and T.A.A., who was born in October 2016.[1] In their respective appellate issues, Mother and Father challenge the sufficiency of the evidence to support the trial court's predicate-ground and best-interest findings. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering environment), (E) (endangering conduct), (O) (failing to comply with court-ordered services), (P) (using controlled substance in manner that endangered health or safety of child and failing to complete court-ordered substance abuse program), (2). Mother also challenges the sufficiency of the

---

[1] We refer to the parents by their initials or as Mother and Father, and we refer to the children by their initials. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The trial court granted possessory conservatorship of K.L.H. to her biological father K.H., and he has not appealed from the order of termination.

evidence to support K.L.H.'s biological father, K.H., retaining his parental rights to K.L.H. For the following reasons, we affirm the trial court's order of termination.

## BACKGROUND

In October 2019, the Department became involved with Mother, Father, and the four children because they were living out of a van in an apartment complex parking lot and there were concerns about the parents' drug use, the family's living conditions, and the children's safety. The parents voluntarily agreed to a safety placement for the children with their maternal great grandmother and their great aunt (Aunt).

In December 2019, the parents were court-ordered to participate in services. They, however, failed to comply with the court order and, in April 2020, the Department filed an amended petition seeking to be appointed the children's temporary managing conservator and to terminate parental rights. Among the Department's concerns, the parents had not been participating in services, including drug testing, and one of the children had made an outcry that Father was selling drugs. In July 2020, the trial court appointed the Department as the children's temporary managing conservator and continued their placement with their maternal relatives.

During the case, both parents tested positive and did not show up for court-ordered drug screenings for months at a time. Mother and Father tested positive for methamphetamine and marijuana in August 2020; Father tested positive for marijuana in October 2020, April 2021, and June 2021; and Mother tested positive for marijuana in September 2020, October 2020, April 2021, August 2021, and January 2022. Mother also acknowledged that she had been a victim of domestic violence but represented to the Department that she and Father were separated. Father was ordered to stay 200 yards away from Mother and the children's placement, school, or daycare. Mother's visits progressed to unsupervised, and

2

she sought a monitored return, but the trial court denied her request and discontinued her unsupervised visits.  Mother had told K.L.H. that she was pregnant and had a miscarriage, and Mother continued to miss drug screenings.

After multiple extensions of the dismissal date, the jury trial occurred in April 2022.  The witnesses consisted of Mother, Father, K.L.H., Aunt, a clinical psychologist who evaluated five family members, the children's therapist, the conservatorship supervisor and caseworker, and the CASA volunteer.  The Department sought to terminate the parental rights of Mother and Father because of its continuing concerns about their parental abilities.  If the parents' rights were terminated, the Department's plan was for the children to remain in their placement with their maternal relatives and for K.L.H.'s biological father to be appointed as her possessory conservator.

Mother and Father were both employed, lived together in an apartment, and planned to co-parent if the children were returned to them.  Although the parents had represented to the Department that they were separated during the case and Mother's attorney made this representation in her opening statement,[2] they had been living together in the apartment since September 2021.

---

[2]  In her opening statement, Mother's attorney represented that the evidence would show that:

> [Mother] has addressed the domestic violence allegations, the drug use allegations, in her way and has been able to maintain a stable household, maintain her own household, as well as protect herself from—and prevent any incidents of domestic violence or law enforcement involvement since deciding to separate from [Father].

> The evidence will also show that she's not in an antagonistic relationship with [Father]; she's not in adversarial relationship with [Father]; and that, you know, she wishes for him to be a good father to the children and wants the children to have that—a good relationship with their father.  However, she's not team [Father].  She feels like he has a lot of things that he has to work on himself, and

K.L.H., who was fourteen at the time of trial, testified before Mother and Father testified. She testified that she "believe[d] that [Mother's] still with him currently," that it was hard to believe Mother when "she says she's not" with Father "as much as she lies," and that she "did not trust [Mother] enough" not to go back to Father. K.L.H. also testified that she had not been truthful with the Department in the past about her living situation. She explained that she was "scared of what [Father] might do or what he might do to [Mother]" but that she actually had not been safe and got "whoopings" and that her parents "smoked weed." As to living in the van, she testified that they were "just all smooshed in there" and "really uncomfortable"; that she "knew there [were] ecstasy pills going around multiple times" and that Mother and Father "would both take it a lot"; that she "knew that [Father] was selling drugs" and her mother wanted to start doing so but did not; that Father hid drugs in "socks," K.L.H.'s backpack, and "the vehicle they were in"; that their clothes were "just nasty and dirty"; that they only took showers "every so often"; that "you could literally . . . scrape the dirt off [their] skin"; and that she was not going to school.

K.L.H. asked the jury to terminate Mother's and Father's rights to her and her siblings. She did not believe that there should be any contact with them. She testified that Father had "threatened to kick [her] out" multiple times; that Mother and Father "promise so many things, and they never do it"; and that she and her siblings were "honestly tired of it." She explained that she had suicidal thoughts because Mother "was putting [her] through so much stress," "the things" Father was doing, and "the lies and things." She did not want to visit with

that's for him to do and not for her to be involved with. And that a romantic relationship for them is just no longer tenable. And they can still have a co-parent relationship and—that's reasonable and they're able to discuss things in a mature and responsible fashion.

Mother because "what is the point" when Mother's "actions [were] not adding up," but she recently had gone to visits with Mother because her siblings wanted her to be there. She testified about verbal fights between Mother and Father where they tried to draw her in and about an incident where Father threw Mother on the bed because "he didn't want her to leave" and that there was a point where they kept a "suitcase and bags packed" in case Mother wanted to leave but she "just runs back." As to her current placement with her maternal relatives, K.L.H. testified that they provide "the perfect amount of structure that we need in our life" and gave them "the attention and love that we need and deserve."

Following K.L.H.'s testimony, Father and Mother testified. They admitted that they had been living together. Father testified that they had been living together since September 2021, that their plan was to be together and co-parent their children, and that he had been working as a limo driver for about two weeks. He admitted that he continued to use marijuana but denied knowing that he needed to notify the Department that they were living together and testified that he stopped complying with services because "[i]t doesn't help." He further testified that the children's trauma was after they were removed from their parents, that Mother had to say that they were separated because of the Department's threats, that she made up the domestic violence, and that the Department tried to have him deported. He also denied that he had been dealing drugs or that he threatened to kick K.L.H. out.

Mother similarly admitted that she and Father were living together and that she had been with him for the majority of the case. She denied domestic violence but testified that she told the Department that she was not in a relationship with Father and that there was domestic violence in the home "to try to appease CPS" and that she was told to separate "so that [she] could get family reunification." She testified that she made up a story with her

5

caseworker's help about Father chasing her with a machete to try to get into a shelter. She also admitted that she made up that she was pregnant during the case. Mother denied using methamphetamine, but she admitted to using marijuana. When asked why she lied to her children, Mother refused to answer, instead invoking the Fifth Amendment. She believed that she had a stable and safe home and testified that the three youngest children had voiced that they want to come home and were not afraid of Father and that K.L.H. was not suicidal when with her. She also testified that Father had made significant positive changes and that she thought the children would see a difference in Father if they came home so that "there won't be a concern of safety anymore."

The exhibits included the test results showing positive test results from drug screenings for Mother and Father, the family service plans for Mother and Father, redacted court orders, and the psychological evaluations of family members. The psychologist who provided the evaluations testified that Mother had post-traumatic stress disorder from being emotionally abused by Father, that K.L.H. had major depressive disorder and suicidal ideation, and that the other children also were suffering from trauma from instability that they experienced in their home life. She believed it was in the children's best interest to terminate parental rights and for Father and Mother not to be a regular part of the children's lives. She expressed concern that the children's symptoms from their trauma would not improve if they were returned to Father and Mother and that the children needed nurturing, structure, love, and therapy.

The therapist for the children, the CASA volunteer, and Aunt also believed that it was in the best interest of the children to terminate parental rights. The therapist testified that the children were all "suffering from complex trauma" and that the trauma "stems from childhood abuse," being neglected and exposed to family violence and uncertainty, and not being able to

6

trust their caregivers. He testified that the children had improved in their placement, that they were happy and thriving, and that their placement was providing structure and stability and meeting the children's needs. He expressed his fear that the children would lose the progress that they had made if they were returned to their parents and that they would be exposed to a "dysfunctional, stressful environment." Although the youngest child expressed that she wanted to be with Mother and the two middle children fluctuated about wanting to be with Mother, the therapist testified that the children did not express a desire to be with Father and were afraid of him; that it was not safe to place the children with Father; that it would not be healthy for them to be subjected to his aggression, anger, and "abusive manners"; and that the children did not trust Mother to protect them.

The CASA volunteer testified that she "had suspicions" that Father and Mother were together but that Mother told her during the case that "they [were] apart," that it was concerning because she did not believe that Mother could be protective and Father had not addressed his issues and was not a good parent for the children, and that Father's "controlling behavior and the fear that he instills in the children [was] extremely concerning to CASA." She testified that Aunt was "phenomenal" and had "been extraordinary in getting [the children] what they need in many areas," that Mother had not addressed the emotional and educational needs of the children when in her care, and that Father and Mother had not demonstrated that they had the necessary parental abilities to take care of the children.

Aunt testified about her reasons for believing that it would be best if she adopted the children:

> I think it's best that I'm able to adopt [the three younger children] and [K.L.H.] because they need that stability. They need to be able to be—to realize, you know, that someone reliable is there, no broken promises, not having to fear for

7

> what's going to happen, knowing that they're going to be truly taken care of and loved like they should be.

She testified that prior to the children's placement with her and great grandmother, the children had not been going to school and were "behind majorly" and that after they were placed with her and great grandmother, they had made "some great strides." She also was not opposed to updating the parents on the children and was willing to work with the children's therapist or psychologist if it would be helpful to the children to have a relationship with Father and Mother.

The jury found that Mother, as to all four children, and Father, as to his three children, knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being, failed to comply with court-ordered services, used a controlled substance in an endangering manner without completing a court-ordered substance abuse treatment program or after completing a treatment program, and that it was in the children's best interest for parental rights to be terminated. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), (2). The jury also found that K.H. should be named a possessory conservator of K.L.H.

In its order of termination, the trial court terminated the parental rights of Father and Mother on the grounds found by the jury, appointed the Department as the children's permanent managing conservator, and appointed K.H. as a possessory conservator of K.L.H. This appeal followed.

8

## ANALYSIS

**Standard of Review**

To terminate parental rights under section 161.001, the Department has the burden to prove by clear and convincing evidence one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (stating definition of "clear-and-convincing burden of proof" (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979))).

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* at 631. "Evidence is factually insufficient if, in

light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. We must give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *see In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (noting that when reviewing termination order, appellate courts defer to "factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

**Endangerment Grounds**

Although Mother and Father challenge each of the jury's predicate-ground findings, we limit our review to their challenges to the sufficiency of the evidence to support the jury's findings under subsections (D) and (E)—that (i) Mother and Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, and (ii) Mother and Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging subsection (D) or (E) finding because of their collateral consequences in future termination proceedings). Mother

challenges the legal sufficiency of the evidence and Father challenges the legal and factual sufficiency of the evidence to support the endangerment findings.[3]

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," the conduct does not have to occur in the presence of the child, and courts may look to conduct "both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* at *14 (citing *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)).

---

[3] The Department argues that this Court should overrule Father's issues challenging the sufficiency of the evidence because he did not preserve them for this Court's review. *See J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00187-CV, 2022 Tex. App. LEXIS 7608, at *36 (Tex. App.—Austin Oct. 13, 2022, no pet. h.) (mem. op.) (concluding that parent waived sufficiency challenges by failing to take action to preserve); *In re A.P.*, No. 05-19-01536-CV, 2020 Tex. App. LEXIS 4321, at *13–15 (Tex. App.—Dallas June 10, 2020, no pet.) (mem. op.) (concluding in appeal from termination of parent's rights that parent had not preserved challenge to sufficiency of evidence "because she failed to take any of the steps in the trial court necessary to do so" and describing preservation rules). In the interest of justice and because of the importance of the rights involved, however, we review the sufficiency of the evidence to support the jury's endangerment findings against Father. *See, e.g.*, *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (explaining that due process concerns "coupled with the requirement of a meaningful appeal" demand review of evidence supporting trial court's findings under subsections (D) and (E)); *W.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00134-CV, 2014 Tex. App. LEXIS 9173, at *2 (Tex. App.—Austin Aug. 20, 2014, no pet.) (mem. op.) (reviewing sufficiency of evidence in interest of justice and because of importance of issues in appeal from judgment terminating parental rights following jury trial even though parent had not preserved challenge).

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* at *10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

Mother argues that the evidence is legally insufficient to support the endangerment findings against her because she "had shown significant effort." She argues that there was little or no evidence that she had not completed many service hours; that she had a stable home, job, and transportation; and that she was available to help the children. She compares herself with K.H. who was incarcerated and had not been able to do services. She argues that because K.H. was allowed to keep his rights, she "should have been allowed to keep her rights," particularly because "there was testimony that the younger children wanted to return

12

to their mother." She argues that "termination on the (D) ground is unconscionable where the parent could not have completed services that were not set up, or not required, specifically family therapy and drug treatment" and that the case started, "in large part, because of poverty and homelessness," not because the children were placed in "unsafe circumstances." As to subsection (E), Mother argues that termination on this ground is "unfair where the parent had done a lot of her services" and she maintained that no domestic violence had occurred, making the finding "not certain." She acknowledges the evidence that the children were afraid of Father but argues that conservatorship "may have been more appropriate."

Father argues that there was no evidence that the children's living conditions endangered the children because they were residing in apartments in a complex where he was performing maintenance work; the fact that the children were not in school did not by itself create an endangering environment; poverty, temporary homelessness, and "squatting" did not constitute an endangering environment; and the family had previously been living with their maternal relatives, with whom the Department placed the children. Father also characterizes the Department's evidence to be limited to the loud and forceful way he expressed himself, unsubstantiated allegations of domestic violence, and his spanking K.L.H. "four years prior to trial" and being "at times" "insensitive" about her weight gain. He relies on his and Mother's testimony denying domestic violence and the lack of any records of arrests or convictions.

The jury, however, reasonably could have found the testimony of Mother and Father not credible. *See In re A.B.*, 437 S.W.3d at 503. Mother admitted in her testimony that she had not been truthful to the Department or her children during the case, including being untruthful about her relationship with Father. Not until after Mother's attorney's opening statement did Mother and Father admit that they were living together. Mother also testified that

13

she had not been truthful about being pregnant during the case and testified that she made up allegations of domestic violence by Father to appease the Department. K.L.H. also testified that Mother was not truthful and that K.L.H. did not trust her.

The jury also reasonably could have believed K.L.H.'s testimony that Mother was not protective and that Father was abusive and the evidence about the family's unstable and unsanitary living conditions and the Mother's and Father's concerning conduct prior to the children's removal. K.L.M testified that when the family was living in the van, Father was selling and using illegal drugs, he sometimes hid the drugs in her backpack, and Mother was using illegal drugs. *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) ("Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E)."); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." (citation omitted)).

The jury also could have credited the evidence that the children suffered from abuse, neglect, and exposure to domestic violence when they were living with Mother and Father. *See V.P.*, 2020 Tex. App. LEXIS 938, at *9–10 (noting that "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)"). K.L.H. testified that she witnessed

14

Father throwing Mother onto a bed so she could not leave, that they had their suitcases packed in case Mother wanted to leave but she "just runs back," that Father was verbally and physically abusive to her, and that Mother did not protect her. K.L.H. testified that Father would hit her with "[h]ands, belt, and occasionally—usually sometimes what he can use, like close to him. So it'd be, like, the back scratcher." She testified that it hurt when he hit her and that her Mother did "[n]othing" and "[m]ost of the time" defended him for doing it. The therapist also testified that the children were "suffering from complex trauma" and that the trauma "stems from childhood abuse," being neglected, exposed to family violence and uncertainty, and not being able to trust their caregivers.

The evidence also showed that during the case, the parents went months without drug screenings and tested positive for methamphetamine in August 2020 and for marijuana multiple times. *See J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 Tex. App. LEXIS 9308, at *18–19 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.) (considering ongoing drug use after child was removed as evidence of endangering course of conduct); *In re C.V.L.*, 591 S.W.3d at 751 ("Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)."); *see also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A factfinder reasonably could infer that [parent's] failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs."); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (same).

Viewing the evidence under the applicable standards of review, we conclude that it was legally sufficient to support the endangerment findings against Mother and legally and

factually sufficient to support the endangerment findings against Father. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule their first and second issues and do not reach their third and fourth issues addressing subsections (O) and (P). *See* Tex. Fam. Code § 161.001(b)(1)(O), (P); *In re N.G.*, 577 S.W.3d at 232–33.

**Best Interest**

In their fifth issues, Mother challenges the factual sufficiency of the evidence and Father challenges the legal and factual sufficiency of the evidence to support that termination of their respective parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt,* 2010 Tex. App. LEXIS 10272, at *22–23.

16

Mother argues that "it is not clear that the jury could find that is was in the best interest of the children" for her rights to be terminated when the adoptive placement was not necessarily willing to allow post-termination contact, the youngest child wanted to have a relationship with her and return to her, another parent was able to maintain parental rights "despite their incarceration," and the Department did not set up family therapy with the children, which "might have affected the outcome of the case." She argues that her parental rights should not have been terminated "when a conservatorship agreement might have been more appropriate." Mother, however, admitted that she was living with Father at the time of trial and planning to co-parent if the children were returned to her. Although Mother testified that the children were not afraid of Father, that Father had made significant positive changes, and that she thought the children would see a difference in Father if they came home so that "there won't be a concern of safety anymore," the jury did not have to believe this testimony and reasonably could have believed the evidence that the children had reason to be and were afraid of Father.

The therapist and the caseworker testified that the children had told them that they were afraid of Father. The caseworker testified that the four children had told her "that they do not feel safe in the presence of their father," "that they are uncomfortable at visits," and that "they didn't want to be around him." She explained:

> Father has been aggressive and inconsistent, and he has put fear into his children by his behaviors and his actions and his active choices that have caused his children harm and left them in foster care for an extended period of time.

The caseworker further testified that Mother had been "unable to provide a safe, consistent environment for her children," "to take the necessary steps it takes to even attempt to create a safe environment for her children," or to "choose to engage in safe relationships and put their best interest forward."

As support for his position that it was not in his children's best interest to terminate his parental rights, Father relies on his visits with his children. He recognizes that "there was ample evidence that the children were thriving under [Aunt's] care" but argues that "there also was evidence that [his children] enjoyed seeing him." He characterizes the evidence as supporting that, "absent one visit where [he] became upset," his visits with the children were "appropriate." The caseworker, however, testified about her concerns with Father's conduct during visits, including an incident where he yelled at her. She also testified that for over half of the visits that she observed, Father needed "redirection." Further, K.L.H. testified that she did not believe that the children should have contact with Mother and Father, and she stopped visits with Father during the case.

In reaching its best-interest findings, the jury reasonably could have believed the testimony and other evidence that Mother and Father engaged in endangering conduct when the children were in their care and during the case. *See Holley*, 544 S.W.2d at 371–72 (listing among factors acts or omissions by parent showing parent-child relationship was not proper); *see also In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23. Other than Mother and Father, the Department's witnesses uniformly testified to their beliefs that termination of parental rights was in the children's best interest and provided the underlying bases for their beliefs. For example, the therapist and the psychologist testified about the trauma that the children had suffered when they were in the care of Mother and Father and expressed their concerns that the children's symptoms would not improve and that they would lose the progress that they had made if they were returned to the parents. *See Holley*, 544 S.W.2d at 371–72 (listing among factors parental abilities and needs and danger to children in future). The evidence also showed that the children were thriving in their current placement; that Aunt was

18

providing the love, stability, and structure that the children needed; that Aunt hoped to adopt the children; and that Aunt would allow continued contact between the parents and the children if appropriate. *See id.* (listing among factors plans for children by individual or agency seeking custody).

Viewing the evidence under the applicable standards of review, we conclude that it was factually sufficient to support the jury's best-interest finding against Mother and legally and factually sufficient to support the jury's best interest finding against Father. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule the parents' respective fifth issues.

## K.H.'s Parental Rights to K.L.H.

In her sixth issue, Mother argues that the evidence is legally and factually insufficient to support the jury's finding that retaining K.H.'s parental rights was in K.L.H.'s best interest.

Because we have concluded that the evidence was sufficient to support termination of Mother's parental rights, we conclude that she does not have standing to challenge the portion of the trial court's order that appointed K.H. as a possessory conservator of K.L.H. *See* Tex. Fam. Code § 161.206(b) (stating generally that "an order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other"); *In re Y.V.*, No. 02-12-00514-CV, 2013 Tex. App. LEXIS 7291, at \*3–4 (Tex. App.— Fort Worth June 13, 2013, no pet.) (mem. op.) (concluding that because father was bound by portion of trial court's order terminating his parental rights, he lacked standing to challenge portion of termination order appointing Department as permanent managing conservator); *see also A.P. v. Texas Dep't of Fam. & Protective Servs.*, Nos. 03-18-00780-CV, 03-18-00781-CV,

2019 Tex. App. LEXIS 2268, at *2–4 (Tex. App.—Austin Mar. 26, 2019, no pet.) (mem. op.) (concluding in context of parents' appeal from judgment terminating their parental rights, that parents lacked standing to challenge trial court's ruling as to grandmother's petition in intervention and collecting cases in which court concluded that appealing party lacked standing to complain of errors that did not injuriously affect party or that affected rights of others). We overrule Mother's sixth issue.

## CONCLUSION

Having overruled Mother's and Father's dispositive issues, we affirm the trial court's order of termination.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed:   October 27, 2022